**UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

Raul Varela,
Petitioner
-vs-
Charles L. Ryan, et al.,
Respondents.

CV-15-1971-PHX-JJT (JFM)

**Report & Recommendation
on Petition for Writ of Habeas Corpus**

## I.  MATTER UNDER CONSIDERATION

Petitioner, presently incarcerated in the Arizona State Prison Complex at Florence, Arizona, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on October 1, 2015 (Doc. 1).   On February 9, 2016 Respondents filed their Response (Doc. 13).   Petitioner has not filed a Reply.

The Petitioner's Petition is now ripe for consideration.   Accordingly, the undersigned makes the following proposed findings of fact, report, and recommendation pursuant to Rule 8(b), Rules Governing Section 2254 Cases, Rule 72(b), Federal Rules of Civil Procedure, 28 U.S.C. § 636(b) and Rule 72.2(a)(2), Local Rules of Civil Procedure.

## II.  RELEVANT FACTUAL & PROCEDURAL BACKGROUND
### A.  FACTUAL BACKGROUND

In disposing of Petitioner's direct appeal, the Arizona Court of Appeals summarized the factual background as follows:

> Varela and his wife, Tricia Varela, were tried together on multiple charges of child abuse stemming from their physical treatment of their recently-adopted daughter, E., when she refused to use the toilet. Specifically, in Count 3, the State alleged Varela intentionally or knowingly endangered E.'s life in violation of Arizona Revised Statutes ("A.R.S.") section 13-3623(A) (2010)

1

because he did not seek medical care until two days after Tricia injured E. during a three-hour "power struggle" that involved physically restraining E. on the toilet and subsequently struggling with her in a closet and striking her with a shoe. In Count 6, the State charged Varela with intentional or knowing child abuse in violation of A.R.S. § 13-3623(B) based on previous instances where he bruised E. by forcibly restraining her on the toilet.

Detectives JH and AY conducted an interview with Varela the day after E. was taken to the hospital ("the Interview"). At the time of the Interview, the detectives mistakenly believed E's arm and leg were fractured. Detective JH later testified at trial this belief was incorrect and E. had no broken bones. Upon informing Varela of E's broken limbs, Varela made incriminating statements.

(Exhibit I, Mem. Dec. 7/15/14 at ¶¶ 2-3.)   (Exhibits to the Answer, Doc. 13, are referenced herein as "Exhibit ___.")

Tricia explained to Detective JH that E. had issues going to the bathroom, and she and Varela would restrain E. on the toilet for up to an hour while "pushing her mid-section into her legs."  E. would struggle and try to get away. During his Interview, Varela admitted that prior to E.'s struggle with Tricia, E.'s belly was distended and she had developed bruises from being restrained earlier in the week. He agreed that, generally, upon noticing a child's stomach is distended and hurting, a reasonable person would take the child to the doctor. He agreed E.'s fever, vomiting, and withholding stool and urine were all red flags indicating something was wrong. And he further admitted taking E. to the doctor was going to "raise some flags" based upon the bruising to her arms and legs, and he knew when he took E. to the hospital that CPS would be called.

(*Id.* at ¶ 9.)

Doctor Kirsch, a pediatrician who evaluates patients for potential child abuse, opined that E.'s abdominal injuries were caused by trauma, specifically, "significant pressure," "crush injury," and "squeezing." She further testified E. was "extremely critical ill" and had E. gone untreated "it is possible that she would have died."

(*Id.* at ¶ 11.)

## B.   PROCEEDINGS AT TRIAL

On June 24, 2009, Petitioner and his wife were indicted in Maricopa County Superior Court.  Petitioner was charged with one count of Class 2 child abuse, and one count of Class 4 child abuse.  (Exhibit A, Indictment.)

Petitioner and his wife proceeded to trial on March 5, 2012.  (Exhibit V, R.T. 3/5/12.)  However, the jury was unable to reach a verdict on any of the charges against

2

Petitioner.  They found Petitioner's wife guilty on one count, a lesser-included offense of reckless child abuse, and were unable to reach a verdict on the other three charges against her.  (Exhibit HH, R.T. 3/29/12 at 10-11.)

Petitioner and his wife again proceeded to trial on July 16, 2012 on the remaining charges.  (Exhibit MM, R.T. 7/18/12.)   The parties stipulated to add language to the instructions on the various charges to clarify the specific conduct associated with the charges.  (*Id.* at 4-7.)   With regard to Count 3, the parties stipulated and the court instructed the jury that the charge was based on the failure to seek medical care:

> Count 3 alleges that Raul Varela, on or  about the 25th day of April of 2009 and the 27th day of  April of 2009, under circumstances likely to produce  death or serious physical injury, and while having the  care or custody of [E.V.], a child under the age of  15 years of age, intentionally or knowingly caused or  permitted [E.V.]'s person or health to be injured  or [E.V.] to be placed in a situation where her  person or health was endangered**, *to wit, failure to seek medical care*.**

(Exhibit MM, R.T. 7/18/12 at 23-24 (opening instructions) (emphasis added). *See also* Exhibit WW, R.T. 8/9/12 at 51-52 (final instructions).)

In light of Petitioner's single claim, the undersigned's recitation of the evidence will be limited to evidence concerning the allegations that his delay in seeking medical treatment amounted to endangerment under circumstances likely to cause death or serious physical injury.  There was substantial evidence of varying degrees of physical injury inflicted on the victim in the course of the reported struggle with the 4 year old victim.  But of course those facts are relevant to this habeas case only to the extent that it is related to whether Petitioner's delay in seeking medical care was endangerment under circumstances likely to cause death or serious physical injury.

In the course of the trial, there was substantial testimony, most of it uncontroverted, about the injuries to the victim, and the resulting course of treatment, including the following.

**Dr. Rosenberg**, a pediatric critical care physician at Maricopa Medical Center (MMC), was called by the prosecution. (Exhibit MM, R.T. 7/18/12 at 79-128.)   He

testified that in conjunction with resident physicians in training, he provided initial care for the victim after her transfer from another hospital to the pediatric intensive care unit (PICU) of MMC on April 28, 2009 at 6:30 a.m.. (*Id.* at 86-88.)  The victim came in with a history of bruising, constipation, encopresis (watery leakage around a large hard stool), and abnormal behavior.  (*Id.* at 89.)  They observed bruises of varying but unknown ages on her chest, breast, and extremities, and scabs on her extremities. (*Id.* at 90-94, 113-114.)  They also observed a distended abdomen, decreased bowel sounds, blood counts reflecting a possible infection of unknown origin, and dehydration.  (*Id.* at 95-97.)  The distended abdomen could have resulted from severe constipation, infection, or trauma, and the origin was initially unknown.  (*Id.* at 108-109.) She was admitted to the hospital because of the dehydration, concerns of infection related to the distended abdomen and decreased bowel sounds, and the possibility of trauma.  (*Id.* at 97-98.) He deemed the victim seriously ill, "not on death's door, but she was sick enough she needed close monitoring." (*Id.* at 99.)

Dr. Rosenberg next treated the victim on May 13, 2009, after she had surgery to drain an abscess in her abdomen, which he related to bleeding in the abdomen, resulting from blunt trauma, which developed into a blod clot, which eventually became infected. (*Id.* at 101-103, 124.)  He admitted that such bleeding does not always result in an abscess, and that the blood clot was not of itself life threatening, until it became infected. (*Id.* at 117-119.)  The bleeding had not been initially discovered, and there was no sign at admission or on the initial CT scan of the abscess, although there was on later films.  (*Id.* at 110-111, 115, 124.)  The abscess would have developed over time, and would have shown symptoms of swelling, redness, maybe even something like a big pimple, and usually hot and tender. (*Id.* at 122.)  The infection could have been already present in her body, and would not have been life threatening but for the blood clot that became infected.  (*Id.* at 125-126.)

On May 13th, previously observed renal insufficiency had improved, and appeared related to dehydration.  (*Id.* at 104, 119.)   Over the next four days, she continued to

improve.  (*Id.* at 105-106.)  He opined that her condition was life-threatening because of

the abscess that developed:

> Q Now, with regard to [E.]'s, knowing what her condition eventually turned into, even while in the hospital, was her condition life-threatening?
> A Yes.
> Q Can you explain to us why?
> A When the abscess developed, she was at that point she was the sickest she had been because of some infection that was involved in the abscess, yes.
> Q And had that continued unchecked, what would have occurred with her?
> A She **could have died**.

(*Id.* at 106-107 (emphasis added).)

**Sergeant Hughes**, an investigating officer, testified (Exhibit NN, R.T. 7/23/12 at 14-59; Exhibit TT, R.T. 8/6/12 at 32-52; Exhibit UU, R.T. 8/7/12 at 18-72) that upon seeing the victim in the hospital within 24 hours of admission (Exhibit NN, R.T. 7/23/12 at 23) that she had bruises in her ears, on her face, back, palms, arms, wrists, upper arms, insides and outsides of her thighs. (*Id.* at 32.)  In addition there were scratches on her back. (*Id.*)

He testified that Petitioner and his wife had told him that on Saturday, April 25 they had tried treating the victim, by giving her Epsom salt baths as a muscle relaxer and to reduce swelling, icing her bruises, putting lotion on her cuts and giving her Feverall suppositories. (Exhibit UU, R.T. 8/7/12 at 27, 39-40.) Petitioner told the detective that the victim had had a stomach ache and fever, and had at times shown improvement, but once she started to vomit green bile, they took her to the hospital.  (*Id.* at 35-36.) Petitioner and his wife told the detective that they had only had ten hours sleep in the previous two days because they had been sitting up caring for the victim.  (*Id.* at 70-71.) Petitioner's wife told the detective that one of their sons had had the flu or a cold that Saturday.  (*Id.* at 36.)

**Dr. Bailey**, a pediatric surgeon, testified (Exhibit NN, R.T. 7/23/12 at 61-90) that he was asked to consult regarding the victim on April 30, 2009, and to specifically address potential injury to the pancreas or duodenum (the portion of the small intestine

directly empting the stomach).  (*Id.* at 71-72.)  They conducted a CT scan of the abdomen and pelvis, including the area where the drains were eventually placed, which he reviewed with a pediatric radiologist.  (*Id.* at 82.)  They discovered no injury to the duodenum or pancreas. (*Id.* at 72, 83.)  If the radiologist had seen other areas of concern on the CT scan, they would have brought it to his attention, but nothing was raised.  (*Id.* at 86.)  He paid the most attention to the pancreas and duodenum, but would have addressed other glaring issues if they had been seen on the CT scan.  (*Id.* at 88.)

Following surgery by Dr. Cox and resident Dr. Hibbert on May 12th, he next saw the victim for post-operative care on May 18th.  (*Id.* at 73-74.)  His care was related to drains surgically implanted in the victim's lower abdomen and flank, that had been placed to allow pus to drain from the infected area.  (*Id.* at 74-75.)  The infection had resolved by May 20th, and the drains were removed.  (*Id.* at 78-79.)

**RN Giannini** testified (Exhibit NN, R.T. 7/23/12 at 92-111) that she was working as a charge nurse at West Valley Hospital when the victim was admitted at or prior to 23:45 in obvious pain, pale, and with an elevated pulse, bruising on her extremities and legs, and a reported history of diarrhea and vomiting for the prior day.  (*Id.* at 94-98, 102)  The victim was given IV fluids and medication to sedate her. (*Id.* at 100-101.)  She was eventually transferred, once medically stable although still critical, to MMC because there was no pediatric center at her hospital.  (*Id.* at 103-107.)

**Dr. Lal**, a pediatric intensivist at MMC's PICU, testified (Exhibit PP, R.T. 7/25/12 at 4-46) that the victim was admitted on <u>April 29, 2009</u> with complaints of vomiting, diarrhea, dehydration from the vomiting, bruising suspected as nonaccidental trauma, slight distention of the abdomen, and absent bowel sounds  (*Id.* at 7-8, 31-32, 45.)   He next saw her on <u>May 1</u>, and sometime in between she had been given a transfusion because her hemoglobin was low, and antibiotics because they suspected infection in the abdomen and as a precaution. (*Id.* at 11-13, 25, 35.)  A provider ordered a CT scan, but it showed nothing that made them change her treatment. (*Id.* at 35-37.)  On <u>May 2</u>, he saw her and her abdomen was still distended with no bowel sounds, and he

6

gave her IV fluids and continued the antibiotics.  They still had not diagnosed the cause (*Id.* at 14-15.)  By <u>May 3</u>, her bowel sounds were slowly appearing, but she had widespread edema, as part of a systemic inflammatory response, which could have been from injuries, bacteria, a virus, or infection. (*Id.* at 15-16, 39.)  It normally takes a systemic inflammatory response several days to show up.  (*Id.* at 38.)  She continued on antibiotics and was given IV nutrition.  (*Id.* at 16-17.)  On <u>May 4</u>, her bowel sounds were present, and she had developed some inflammation around her groin that had not been there in the previous week, and that he was concerned was an abscess.  (*Id.* at 17-18, 26.)  A surgery consult was obtained, but reported nothing requiring intervention. (*Id.* at 18, 26.)   On <u>May 5</u> her bowel sounds were improving, but her kidney function was decreasing and her swelling continued, which he related to the antibiotics and the on-going inflammatory response. (*Id.* at 18-19.)  Overall, he believed she was more stable, and not as sick as when she was admitted.  (*Id.* at 20.)  On <u>May 6</u>, her fever and kidney function led him to request consultations from an infectious disease specialist and a kidney specialist, but all they offered was adjustments to the antibiotics.  (*Id.* at 20-21.)  On <u>May 8</u> she was still improving a little. (*Id.* at 21.)  At that time they did not know what was causing her symptoms other than a systemic inflammatory response, and they did not know what was causing that response.  (*Id.* at 39.)

He next saw her on <u>May 19</u>, after she had undergone surgery to drain the abscess in her groin. They monitored her drains, continued the antibiotics and night time feeding tubes, and she had begun eating and was improved.  On <u>May 20</u> they discontinued the antibiotics, although pain medication had been continued throughout.  (*Id.* at 21-22.)  On <u>May 21</u> she had sufficiently improved to be transferred to a regular floor where she remained for some time.  (*Id.* at 23-24.)

He denied knowing the causation for the hematoma. (*Id.* at 27.)  The earlier symptoms (inflammatory response, vomiting, distended abdomen, no bowel sounds) could have resulted from a bacteria or virus.  (*Id.* at 28.)  The slight distension of the abdomen could have resulted from gas.  (*Id.* at 33.)  The abscess resulted from an

abdominal hematoma that got infected.  (*Id.* at 43.)  It takes several days for the blood to collect and get infected, and the hematoma would not necessarily get infected.  (*Id.* at 44.)

**Dr. Kirsch**, a pediatrician and child abuse evaluator, testified (Exhibit PP, R.T. 7/25/12 at 50-142) that she first examined the victim on <u>April 30, 2009</u>, and the victim was extremely irritable and uncomfortable, with a distended abdomen, tender to palpation, bruising on her back and extremities in locations suggesting nonaccidental trauma, scratches on her back, and swelling in her hands, arm and labia.  (*Id.* at 56-59.) There was no bruising to the hands.  (*Id.* at 103-104.)  She also had an abnormal blood cell counts, raising concerns of cancer, and an elevated liver function test, raising concerns of trauma, infections or other liver problems, and a small amount of blood in her urine.  (*Id.*at 61-63.)   She had been admitted with a history of encopresis, gastrointestinal symptoms, constipation, bilious vomiting, dehydration and bruising to the abdomen.  (*Id* at 64, 106.)  She did not see any abdominal bruising on April 30th.  (*Id.* at 102.)  The bruises she saw were not life-threatening.  (*Id.* at 117.)   Bilious vomiting can result from a block in the intestine.  (*Id.* at 120.)  Dehydration in a child for several days can be a serious concern.  (*Id.* at 134.)

The victim was not released on April 30th because she was not medically ready.

> Q And when we are talking about the internal, the fluids that were given internally and the blood transfusion, if [E.V.] had not been in the hospital, what will likely have happened to her without those things?
> A Well, she was critically ill so I will have to be very concerned about what· the outcome would have been for that what she had not received medical treatment, I think that it could have been quite serious.
>      * * *
> Q BY MS. LOW: What was the ***possible outcome*** if she had not gotten the medical treatment?
> A I think that she ***could have potentially died***. I think that was ***a risk***.

(*Id.* at 68-69 (emphasis added).)

The CT scan of the abdomen on <u>May 1</u> ("April 31st") did not show any intra-abdominal injuries, but CT scans do not pick up everything, particularly more subtle

1  injuries such as a tear to an abdominal wall.  (*Id.* at 75-78, 94, 113.)  The hematologist

2  eventually determined the low blood counts were from infections.  (*Id.* at 76.)

3       When Dr. Kirsch's colleague, Dr. Coffman examined the victim on <u>May 5</u>, the

4  victim was developing signs of infection in her abdominal and groin area, suggesting an

5  infection in her abdominal wall.  This started to explain other symptoms  (*Id.* at 80.)  An

6  ultrasound performed on <u>May 4</u> had revealed fluid in her abdominal wall.  (*Id.* at 81, 96.)

7  The collection of fluid created an opportunity for infection. (*Id.* at 82.)  The ultrasound

8  did not show an abscess, just fluids, at that time, and the victim did not require

9  immediate surgery at that time.  (*Id.* at 111.)  Surgery was only required when the

10  infection worsened, and it was unclear whether the abdominal problem was going to

11  resolve on its own.  (*Id* at 111-112.)  Still, she was quite ill prior to the abscess

12  development, because of her anemia.  (*Id.* at 112.)

13       The victim was next seen on <u>May 15</u>, after having had a surgical procedure to

14  drain an abscess in her groin area.  (*Id.* at 83-84.)  The victim was experiencing

15  improvements, which was expected from the drains and antibiotics. (*Id.* at 84-85.)  The

16  wall of the abscess makes it harder for medications to penetrate the affected area,

17  requiring drainage.  (*Id.* at 85.)  She was not surprised that the infection developed after

18  being in the hospital for some time because it takes time for an abscess to form.  (*Id.* at

19  85-86.)   Thus the abscess could have resulted from the abdominal trauma on April 25,

20  2009.  (*Id.* at 86.)  Hematomas (the collection of fluid) do not necessarily become

21  infected and create abscesses.  (*Id.* at 109, 116.)  The expected symptoms from the

22  trauma to her abdomen were pain, vomiting, decreased appetite, abdominal swelling.

23  (*Id.* at 86-87.) She believed the abdominal distention was from the trauma.  (*Id.* at 134.)

24       The infectious disease doctor was of the opinion that the victim started out with a

25  viral type of syndrome, which was compounded by the trauma.  (*Id.* at 88, 97, 135.)

26       Q Okay.  And was the trauma that was suffered to her
    abdomen, was that -- do you believe that that was the only cause of
27  the need for her to be in a hospital for  about a month?
       A I think without the trauma, she will not have required a
28  lengthy hospital stay. I can't say whether the viral syndrome would

9

1
have been enough on its own to might be require her to come to the
emergency room for fluids or something of that sort, but I don't
think that it should have required a lengthy stay.

2
Q Now, with regard to the abdominal trauma she has
suffered, because that later became infected, will you have

3
considered that *life-threatening* if she had not had medical
treatment for it?

4
A Yes.

5
(*Id.* at 88-89.)  Although the victim's condition could have been life threatening if she

6
had not received medical care (*id.* at 140), Dr. Kirsch could not say how quickly medical

7
treatment would have been required.

8
Q Okay. Now, you testified that had this gone on untreated,
she possibly would have died?

9
A I think *it is possible that she would have died*.

10
Q How soon, how much longer will it have to have gone
untreated?

11
THE WITNESS:  I really can't speculate as to how long it
will have taken.

12
(*Id.* at 100 (emphasis added).)

13
Q When is a -- when does someone or rephrase.

14
You mentioned that if [E.V.] had not gone to the
hospital, and if she had not received medical treatment, she *could
have died*?

15
A Yes.

16
Q And that would have been because of the infection?
A Well, she needed blood for one thing, she also was not

17
able to take nutrition by mouth for days. Many days. And so when
you are in that type of a situation, medical care is very necessary.

18
She was also dehydrated, dehydration goes on, people can die from
that as well.

19
(*Id.* at 121-122 (emphasis added).)

20
Q Now, you told defense that some abdominal hematomas
can heal themselves and not all of them are life-threatening. In this

21
particular case, did you feel like [E.V.]'s was life-threatening?

22
A I think knowing now that it did become infected and did
result in an abscess had she not gotten the treatment, I think that
infection could have been extremely serious. I think that there were

23
other things going on with [E.V.] that were very critical which she
initially came in that led me to say that *possibly she could have

24
been in a life-threatening situation*.

25
Q Okay. And I want to make sure we clarify that because
defense really asked you a lot about the individual symptoms that

26
[E.V.] had. You know, whether bruises can be life threatening in
and of themselves or whether you being called into an evaluate just

27
a stomach ache will be usual, given the entire picture of [E.V.] when
she first came into the hospital, if you had been the doctor who

28
admitted her, will you have had serious concerns about her health?
A Absolutely.

10

Q If you had been in that position where you did not know immediately what was causing her various symptoms, would you have said, well, since we don't know, let's just check her out of the hospital?

A Absolutely not.

Q Why not?

A Because she was extremely critically ill.

(*Id.* at 132-133 (emphasis added).)

**Dr. Chundhu**, pediatrician at MMC, testified (Exhibit RR, R.T. 7/30/12 at 63-112) that he first examined the victim on <u>April 30, 2009</u>. She was sick enough to be put in the pediatric ICU which is restricted to patients with potentially life-threatening injury due to the cost compared to the regular pediatric floor. (*Id.* at 104-105.) She had a systemic inflammatory response as show by an elevated heart rate, low blood pressure, low white blood cell count and hemoglobin and platelets, and fever. (*Id.* at 68, 103-104.) In addition she had a soft and tender abdomen, no bowel sounds, and bruises in the abdominal area. (*Id.* at 69, 85.) There was no medical explanation for the bruising. (*Id.* at 102.) The low hemoglobin was indicative of blood loss. (*Id.* at 69-70.) Such loss can come from a bone fracture, liver or spleen laceration, motor vehicle crash, etc., but in the victim's case appeared to be from the abdominal bruising. (*Id.* at 100-101, 107-108.) There was no place else the blood could have been going. (*Id.* at 107.) And, because of the reduced hemoglobin, the bleeding already had to have occurred, and had stopped because of the serial studies of hemoglobin. (*Id.* at 107, 109.)

He ordered an ultrasound and pediatric surgery consult. (*Id.* at 85.) She did not need surgery at the time because there was hope the antibiotics would resolve the infection. (*Id.* at 88-89, 92-93.) It would take as much as three to five days to determine if the antibiotics were not working, and if some improvement were shown, another 7 to 10 days to know. (*Id.* at 109.) The victim initially showed some improvement in her renal function, blood pressure, etc. (*Id.* at 109-110.)

Although they feared an abscess, smaller abscesses resolve on their own, even really small ones in the abdomen. (*Id.* at 98-100.) But, an abscess can also grow to 10 or 20 times its initial size. (*Id.* at 105.0   It would take two to three days for infection to

11

form, but the hemoglobin and white blood cells would be reduced.  (*Id.* at 90.)  There was no infection in the groin at that time. (*Id.* at 92.)  But an abdominal abscess was not really the initial concern, just the blood loss and injuries.  (*Id.* at 111.)

The initial surgery consult and ultrasound were related to the abdominal trauma, which often results in injury to the duodenum or pancreas, which the ultrasound and surgery consult looked for.  (*Id.* at 101-102.)  No injuries were found there.  (*Id.* at 102.)

He next saw the victim on <u>May 7</u>, when her adrenal function had decreased indicating her kidneys were not functioning, an expected development from the systemic inflammatory response. (*Id.* at 71-72, 86.)  The kidney failure is expected 3 to 5 days after the injuries, and takes 7 to 14 days to recover. (*Id.* at 72.)  The planned response was to locate and remove the infection. (*Id.*)  Her symptoms were being treated with fluids, antibiotics, oxygen, and plans to drain any puss.  Her swelling was increased, and was the result of blood vessel joints leaking because of the infection.  (*Id.* at 73.)  In addition, she had developed cellulitis, an infection of the skin and subcutaneous tissue, resulting from the existing infection.  (*Id.* at 74.)  The infection was likely a staph or strep infection, either migrating from the skin, or being carried in the blood from the gut. (*Id.* at 94, 110-111.) Such infections take two to three days or less to develop, dependent upon the amount of bacteria, type of bacteria, and the strength of the patient's immune system.  (*Id.* at 95-96.)

When he saw her on <u>May 9</u>, and she was stabilizing, with improved kidney function, able to be tube fed, but she was still seriously ill.  (*Id.* at 75-76, 86.)  However, she still had symptoms of heartrate, and infection in the groin. (*Id.* at 87.) On <u>May 10</u>, she continued to improve although she continued to have the infection in the right groin area. (*Id.* at 77.)

On <u>May 11</u>, because she was not improving further from the antibiotics, he was concerned about a possible abscess, so he ordered a second ultrasound and surgical consult.  (*Id.* at 81-82, 87-88, 93, 96-97.)  An ultrasound showed blood in the muscles, which resulted in the accumulation of infection internally and cellulitis externally.  (*Id.* at

12

78-79.)  The blood resulted from trauma disrupting the muscle tissue and capillaries, allowing the blood to accumulate, which allowed the bacteria circulating in the blood to multiply, and form pus.  (*Id.* at 79-81.)  That resulted in the abscess, formed of dead tissue, which takes time for the body to reabsorb.  (*Id.* at 91-92.)

He next saw her on <u>May 18</u>, after she had a surgical drain of the abscess. Afterward, she was much improved with her heart rate lower, breathing more comfortable, and tolerating the tube feedings better and transitioning to eating regular food.  (*Id.* at 82-83, 111.)   He last saw her on <u>May 20</u>, and she continued to improve with removal of the oxygen, more food by mouth, and they began to plan transitioning her to the pediatric ward to continue feedings, assist with walking, etc.  (*Id.* at 83-84.)

Had the victim not received the treatment in the hospital and responded to the treatment, it would have been fatal.  (*Id.* at 102-103.)  Her symptoms were related to the abdominal issue.  (*Id.* at 111-112.)

**Blessy Joseph, RN** testified (Exhibit TT, R.T. 8/6/12 at 6-25) that she first saw the victim on <u>April 28</u> at 8:00 a.m., upon being transferred from West Valley.  She was confused, with slurred speech, a fever, bruises and scratches, a tense and tender abdomen, no bowel sounds, a high heart rate, and vomiting.  (*Id.* at 10-11, 22.)  By 10:00 a.m. she was more appropriate, following commands, but her bowel was still tense and she was complaining of abdominal pain, so she was given pain medication.  (*Id.* 11-12.) By noon she was more awake, with bowel sounds still absent.  Because of the bruising, x-rays of her skeleton and abdomen were done, and a gastroenterologist was consulted. (*Id.* at 13-14, 23-24.)

She next saw the victim on <u>May 10</u>.  She was more cooperative and attentive, but still in pain, with a feeding tube in her left hand, tense abdomen with faint bowel sounds. In addition she had generalized swelling.  (*Id.* at 14-15.)  On <u>May 11</u>, she was still in pain with movement, her abdomen was firm and tender.  She had good bowel sounds, but a blister of pus on her right groin.  (*Id.* at 15.)  A pediatric surgery consult was ordered, and an ultrasound.  When they came for the ultrasound, and repositioned the

victim, the right abdomen abscess ruptured, oozing reddish, yellow pus. She gave the victim pain medication. (*Id.* at 16-17.) Later in the evening, the abdominal abscess was still draining, she complained of abdominal pain, and her abdomen was still firm and tender. Surgery for a drain was scheduled for the next day. (*Id.* at 18.)

On May 12, after returning from surgery, the victim was awake and appropriate, playful and watching movies, her abdomen still tender and firm, and a small drainage on the surgical dressing. (*Id.* at 19-20.) On May 18, she was more awake and alert.

**Tricia Varela**, Petitioner's wife, testified (Exhibit VV, R.T. 8/8/12 at 61-155; Exhibit WW, R.T. 8/9/12 at 3-28) that on Sunday, the day after the altercation with the victim, the family stopped for breakfast on the way to church, but the victim complained about her stomach hurting, so she and the victim returned home. The victim was feverish, was given a Feverall suppository, and initially responded but the fever returned. (Exhibit VV. R.T. 8/8/12 at 124-127, 145.) The victim began moving stiffly, and she gave the victim an Epsom salt bath, and noticed the bruising on the victim. (*Id.* at 128.)

The following day, she was trying to feed the victim snacks and fluids, but she was vomiting a lot of it back up. When the victim started vomiting green substances Monday night she and Petitioner decided to take the victim to the hospital, which she did. (*Id.* at 140-141, 144-145; Exhibit WW at 11.)

**Verdicts and Sentence** - The trial concluded as follows:

> A jury found Varela guilty of the charged offenses. The court sentenced Varela to a mitigated sentence of twelve years' flat-time imprisonment for the conviction on Count 3, a class two felony, dangerous crime against children, and domestic violence offense. For the conviction on Count 6, a class four felony and domestic violence offense, the court imposed the presumptive term of two-and-a-half years in prison and ordered the sentences to run concurrently.

(Exhibit I, Mem. Dec. 7/15/14 at ¶ 4; Exhibit C, M.E. 8/14/12; Exhibit D, Sentence.) Consequently, Petitioner is serving an effective 12 years flat time sentence.

/ /

/ /

14

## C.        PROCEEDINGS ON DIRECT APPEAL

Petitioner filed a direct appeal, arguing insufficient evidence to support the conviction on Count 3, error in admission of Petitioner's statements to detectives, and prosecutorial misconduct.  (Exhibit F, Opening Brief.)  The Arizona Court of Appeals rejected each claim, and affirmed Petitioner's conviction and sentences.  (Exhibit I, Mem. Dec. 7/15/14.)

Petitioner sought review from the Arizona Court of Appeals on the insufficient evidence claim.  (Exhibit K, Pet. Rev.)  The Arizona Supreme Court summarily denied review.  (Exhibit M, Order 2/10/15.)

On March 12, 2015, the Arizona Court of Appeal issued its Mandate (Exhibit J).

## D.        PROCEEDINGS ON POST-CONVICTION RELIEF

Petitioner filed a Notice of Post-Conviction Relief on March 23, 2015 (Exhibit N).  Counsel was appointed.  (Exhibit O, M.E. 5/3/15.)  Counsel eventually filed a Notice of Completion of Review (Exhibit P), evidencing an inability to find an issue for review.  Petitioner was granted leave to file a *pro per* petition for post-conviction relief, and counsel was directed to remain in an advisory capacity.  (Exhibit O, M.E. 8/6/15.) Petitioner did not timely do so, and on December 21, 2015, the matter was summarily dismissed.  (Exhibit R, M.E. 12/21/15.)

Petitioner asserts in his Petition that he sought review by the Arizona Court of Appeals and the Arizona Supreme Court on his "First petition", but denies seeking review on his "Second Petition."  (Doc. 1 at 5.)  However, Petitioner does not identify his PCR Petition (*id.* at 3), and references the appellate decisions on direct appeal (*id.* at 2-3).   Respondents allege: "Petitioner did not appeal the dismissal of the PCR." (Answer, Doc. 13 at 6.)  "The allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248.  Petitioner has not filed a reply or otherwise traversed the

allegations in the Answer.  Accordingly, the undersigned finds that Petitioner did not seek further review on his PCR petition.

## E.   PRESENT FEDERAL HABEAS PROCEEDINGS

**Petition** - Petitioner commenced the current case by filing his Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 on October 1, 2015 (Doc. 1).  Petitioner's Petition asserts a single ground for relief: "he was convicted based on a record lacking sufficient evidence to support a jury finding in count 3 that delaying medical treatment endangered the victim's health."  (Petition, Doc. 1 at 6a.)

**Response** – On February 9, 2016, Respondents filed their Response ("Answer") (Doc. 13).  Respondents argue that Ground 1 is without merit, and that the state court's rejection of it must be sustained under the deferential standards of 28 U.S.C. § 2254..

**Reply** - On March 7, 2016, the Court granted Petitioners' Motion for Extension of Time (Doc. 14), giving Petitioner through April 28, 2016 to reply in support of the Petition.  Petitioner has not replied, and the time to do so has passed.

**Supplement** – On July 7, 2016, the Court directed Respondents to supplement the record to address various issues, including:

> (1) the required elements of the offense for which Petitioner was convicted, including whether Petitioner's conduct must have caused the likelihood of death or serious physical injury; (2) whether it was sufficient that Petitioner increased a pre-existing likelihood (as opposed to a mere pre-existing risk) of death or serious physical injury; (3) whether the likelihood of death or serious physical injury is to be assessed with and/or without consideration of available medical treatment; (4) the evidence which established the requisite likelihood (as opposed to possibility) of death or serious physical injury; and ([5]) the evidence which established that Petitioner's conduct created or increased such likelihood.

(Order 7/7/1/6, Doc. 16 at 7.)

On September 9, 2016, Respondents filed their Supplemental Answer (Doc. 20), arguing that: (1) the state court had reasonably applied federal law to the claim; (2) that due to the conduct of Petitioner and his wife, the victim experienced serious physical injuries, and the victim's worsening condition showed a likelihood of death or serious

physical injury from the delay in treatment and that no causation of the likelihood of death or serious physical injury need be shown; (3) the victim's worsening condition showed a likelihood of death or serious physical injury from the delay in treatment; and (4) that available medical treatment need not be considered.

Petitioner did not reply.

## III.   APPLICATION OF LAW TO FACTS
### A.   MERITS OF GROUND ONE – INSUFFICIENT EVIDENCE
#### 1.  Parties' Arguments

In Ground One, Petitioner argues that there was insufficient evidence to support the conviction on Count 3 based on his failure to seek medical care.  Petitioner argues that the prosecution "did not present any evidence that the victim suffered an increased risk of serious physical injury or death by not being taken to the hospital between April 25, 2009 and April 27, 2009."  (Petition, Doc. 1 at 6b.)  Petitioner argues:

> None of the medical staff called by the state testified the victim's tear and subsequent abscess would have been diagnosed and resolved sooner if medical care had been sought prior to be[ing] taken to the hospital on April 27, 2009.

(*Id.*)

Respondents argue the claim is without merit, and the Arizona Court of Appeals properly found so, particularly when applying the deference required under 28 U.S.C. § 2254(d) and (e).

Petitioner does not reply.

#### 2.  Applicable Standards on Habeas Review

**Standard Applicable on Habeas** - While the purpose of a federal habeas proceeding is to search for violations of federal law, in the context of a prisoner "in custody pursuant to the judgment a State court," 28 U.S.C. § 2254(d) and (e), not every error justifies relief.

17

**Errors of Law** - "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied [the law] incorrectly." *Woodford v. Visciotti*, 537 U. S. 19, 24– 25 (2002) (per curiam). To justify habeas relief, a state court's decision must be "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" before relief may be granted. 28 U.S.C. §2254(d)(1).

**Errors of Fact** - Federal courts are further authorized to grant habeas relief in cases where the state-court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). "Or, to put it conversely, a federal court may not second-guess a state court's fact-finding process unless, after review of the state-court record, it determines that the state court was not merely wrong, but actually unreasonable." *Taylor v. Maddox*, 366 F.3d 992, 999 (9th Cir. 2004).

Moreover, a state prisoner is not free to attempt to retry his case in the federal courts by presenting new evidence. There is a well-established presumption of correctness of state court findings of fact. This presumption has been codified at 28 U.S.C. § 2254(e)(1), which states that "a determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner has the burden of proof to rebut the presumption by "clear and convincing evidence."

**Applicable Decisions** – In evaluating state court decisions, the federal habeas court looks through summary opinions to the last reasoned decision. *Robinson v. Ignacio*, 360 F.3d 1044, 1055 (9th Cir. 2004).

## 3. Insufficiency of the Evidence

The Due Process Clause of the Fourteenth Amendment protects a defendant against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). "The Due Process Clause of the Fourteenth Amendment denies States the power

to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense." *Carella v. California*, 491 U.S. 263, 265 (1989) (citation omitted).

Accordingly, in the face of a sufficiency of the evidence claim, the habeas court must determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt. *Wright v. West*, 505 U.S. 277, 290 (1992); *Jackson v. Virginia*, 443 U.S. 307, 324 (1979).   Under *Jackson*, on habeas, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  In making this evaluation, the court must view the evidence in the light most favorable to the prosecution, and must presume the trier of fact resolved conflicting evidence in favor of the prosecution. *Wright*, 505 U.S. at 295-296; *Jackson*, 443 U.S. at 319, 326; *Taylor v. Stainer*, 31 F.3d 907, 908-09 (9th Cir. 1994).

"*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012). Thus, even where evidence is "almost entirely circumstantial and relatively weak," it may be sufficient to support a conviction. *Jones v. Wood*, 207 F.3d 557, 563 (9th Cir.2000).   Indeed, "[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citations omitted).

On the other hand, a jury cannot manufacture gold from straw.  "[A] 'reasonable' inference is one that is supported by a chain of logic, rather than…mere speculation dressed up in the guise of evidence." *Juan H. v. Allen*, 408 F.3d 1262, 1277 (9th Cir. 2005), amended, 04-15562, 2005 WL 1653617 (9th Cir. July 8, 2005).  "Speculation and conjecture cannot take the place of reasonable inferences and evidence—whether direct or circumstantial." *Id.* at 1279.

> The [state court] is, of course, the final arbiter on questions of state law. It has wide latitude in defining and interpreting the elements of [ ] state crimes, and we are precluded on habeas review from reexamining its determinations of state law questions. But a state court is not free to define an element out of existence, or to ignore the element entirely when upholding a criminal conviction. Such a ruling is contrary to clearly established federal law, namely *Jackson v. Virginia*. Indeed, the quintessence of a Jackson claim—the very meaning of *In re Winship*—is that every element of a crime must be proven beyond a reasonable doubt.

*Goldyn v. Hayes*, 444 F.3d 1062, 1070 (9th Cir. 2006)

The application of these principles has been modified by the adoption of the AEDPA.  Under the standard set forth in 28 U.S.C. § 2254(d), to overturn a state court conviction for insufficient evidence, the habeas court must not only determine for itself that no rational trier of fact could have convicted the petitioner, but also that an opposite conclusion by the state court was "contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §2254(e)(1) and (2). *See Martinez v. Johnson*, 255 F.3d 229 (5th Cir. 2001) (habeas court resolves limited question whether the state court's decision to reject a sufficiency of the evidence claim was an objectively unreasonable application of the clearly established federal law").  Thus, the post-AEDPA habeas court now must not only be deferential to the fact-finder, but also deferential to the state court's analysis of the fact-finder's work.  *See Gomez v. Acevedo*, 106 F.3d 192, 198-99 (7th Cir. 1997) (*vacated on other grounds, Gomez v. Detella*, 522 U.S. 801 (1997)).

**4.  Criminal Violation of Endangerment**

"Under Jackson, federal courts must look to state law for "the substantive elements of the criminal offense," but the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law."  *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012).

Here, Petitioner was convicted on Count 3 for a Class 2 intentional or knowing

child abuse, in particular, endangerment,[1] in violation of Ariz. Rev. Stat. § 13-3623(A), (C), and (F).[2]  (Exhibit D, Sentence.)  That statute provides in pertinent part:

> A. Under circumstances likely to produce death or serious physical injury …having the care or custody of a child… who causes or permits a child…to be placed in a situation where the person or health of the child …is endangered is guilty of an offense as follows:
> 1. If done intentionally or knowingly, the offense is a class 2 felony and if the victim is under fifteen years of age it is punishable pursuant to § 13-705.
>                           * * *
> F. For purposes of this section:
> 5. "Serious physical injury" means physical injury that creates a reasonable risk of death or that causes serious or permanent disfigurement, serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb.

Ariz. Rev. Stat. § 13-3623, eff. 1/1/2009.  *See* 2008 Ariz. Legis. Serv. Ch. 301 (H.B. 2207).  This offense has three primary elements: (1) endangerment; (2) the relevant *mens rea*; and (3) the circumstances of a likelihood of death or serious physical injury

**Endangerment** -  The *actus reus* of endangerment is placing a child at a risk of danger.

Actual Injury Not Required - No actual injury of any kind is required to establish endangerment.  In *State v. Nereim*, the Arizona Court of Appeals sustained a conviction even though the child was reportedly "unharmed and unrattled" from having ridden with a drunk driver. 234 Ariz. 105, 110, ¶ 17, 317 P.3d 646, 651 (App. 2014) (addressing Ariz. Rev. Stat. § 13-3623(B) regarding endangerment with no likelihood of death or

---

[1]  "Within the first paragraph, the statute plainly provides three ways—or means—of committing child abuse. They include: (1) causing a child to suffer a physical injury; (2) having the care or custody of a child, causing or permitting the person or health of the child to be injured; and (3) having the care or custody of a child, causing or permitting the child to be placed in a situation where the person or health of the child is endangered." *State v. West*, 238 Ariz. 482, 490, ¶ 21, 362 P.3d 1049, 1057 (App. 2015). Thus § 13-3623(A) also prohibits as child abuse: (1) causing physical injury; and (2) permitting injury to a child in one's care or custody.

[2]  The reference in the Sentence to Ariz. Rev. Stat. § 13-3623(C) seems to be surplusage. The subsection relates solely to allowing a child to enter or remain in a structure or vehicle with dangerous chemicals or drug making equipment. Previous versions of subsection C were the same as the present subsection B, and referenced endangerment without a likelihood of death or serious physical injury.  *See* 2000 Ariz. Legis. Serv. Ch. 50 (H.B. 2395).

serious physical injury). Rather, the potential (*i.e.* "likely to produce") of such injury is all that is required. *State v. Payne*, 233 Ariz. 484, 506-507, ¶ 75, 314 P.3d 1239, 1261-1262 (2013)  ("'serious physical injury' is used only to describe circumstances that must exist when the abuse occurs").

No Probability of Risk Required - Further, only some risk of the danger is required. The danger to which the child is exposed need not be one likely to occur, just a possible danger. "If the legislature had intended to prohibit probable harm rather than possible harm, it would have clearly said so…. Accordingly, we hold that the term 'endanger' in section 13–3623 means to subject to potential harm." *State v. Mahaney*, 193 Ariz. 566, 568, ¶ 15, 975 P.2d 156, 158 (App. 1999) (addressing what is currently Ariz. Rev. Stat. § 13-3623(B)).

More than Every Day Danger - The nature of the danger required is not extreme. At most, the *Mahaney* court conceded that its "definition of 'endanger' requires more than the ordinary danger to which children are exposed on a daily basis."[3] *Id.* at 569, n. 4, 975 P.2d at 159, n. 4.

Causation of Danger - However, the danger must result from the defendant's actions; pre-existing danger from someone else's actions does not suffice. For example, in the unpublished case *State v. West*, 2012 WL 723752 (App. Mar. 5, 2012),[4] the

---

[3] Arguably, this gives the Arizona statute a dizzying reach dependent upon what the jury might consider an ordinary danger. One has to wonder how out of common experience the risk must be. Would allowing a child to play tackle football be out of the ordinary? Snow skiing? Cattle roping? What about failing to vaccinate, or treat a cavity? Or, failing to brush their teeth? Or to brush at least once a day? Or at least twice a day? This is particularly surprising in the case of Class 2 offenses, where the likelihood of substantial physical injury need not be known or even knowable until after the fact.

[4] Respondents suggest this Court should not look to an unpublished decision to determine whether causation of the danger was required. (Supp. Ans., Doc. 20 at 16, n. 7.) Rule 111 of the Arizona Supreme Court generally precludes reliance upon unpublished decisions as precedent. However, courts in the Ninth Circuit have long recognized that such state prohibitions do not govern the Federal Courts in their efforts to ascertain the law of the state in the absence of published decisions, and such decisions supported by reasoned analysis may be deemed persuasive. *See e.g. McSherry v. Block*, 880 F.2d 1049, 1053, n.2 (9th Cir. 1989) (diversity case); *United States v. Boyce*, 38 F. Supp. 3d 1135, 1159, n. 85 (C.D. Cal. 2014), appeal dismissed (Nov. 13, 2014) (tax case); *Prison Legal News v. Lehman*, 397 F.3d 692, 701 (9th Cir. 2005) (civil rights

prosecution charged a husband and wife as a result of the death of a foster child from blows to the head. The child had been in the separate care of each foster parent in the timeframe when the injuries occurred, and the prosecution failed to present evidence as to which had inflicted the blows. The state also asserted charges of endangerment based on a purported delay in seeking medical treatment, arising out of a series of phone calls between the foster parents during the fifty minutes prior to the mother calling 911. The court found insufficient evidence to support the contention. "When the state alleges that a caretaker has endangered a child by failing to obtain prompt medical treatment for the child's injuries, the state must prove the delay increased the child's risk of harm." *Id.* at *7.

> Here, the state's medical experts addressed only the nature of Emily's injuries and the cause of her death. Apart from one physician's generalized testimony that any delay in seeking treatment for these types of head injuries is "terrible" and lowers the likelihood of survival, the state presented no evidence regarding the treatment Emily would have received had she been examined earlier, nor what effect, if any, a delay would have had on her prognosis. Thus, in addition to the lack of substantial evidence that Randall endangered Emily through delay in seeking medical attention, the state presented no evidence any such delay endangered Emily by increasing her risk of harm. Accordingly, the trial court correctly determined there was insufficient evidence to support Randall's conviction under the third means of violating § 13–3623.

*Id.*

**Mens Rea** – Section 13-3623(A) encompasses three different levels of *mens rea*, (intentional/knowing, reckless, and negligent) with different levels of penalty assigned to each.[5] Petitioner was convicted of the most serious, § 13-3623(A)(1), which requires that the defendant intentionally or knowingly endanger the child.

The requisite *mens rea* is directed to the defendant's state of mind with regard to

---

case). Although, Ariz. Rev. Stat. § 12-1861 permits the Arizona Supreme Court to respond to certified questions from United States District Courts, Respondents proffer no argument why a contrary result from the Arizona Supreme Court should be expected on whether endangerment requires causation.

[5] Where there is a likelihood of death or serious physical injury, child abuse is a Class 3 felony when committed recklessly, and a Class 4 felony when committed with criminal negligence. Ariz. Rev. Stat. § 13-3623(A)(2) and (3).

23

the danger to the child.  *See e.g. State v. Fernane,* 185 Ariz. 222, 224, 914 P.2d 1314, 1316 (App. 1995), corrected (Nov. 1, 1995) ("appellant knew K.F. would be in danger if left").  Thus, it is not sufficient that Petitioner intentionally undertook the act.  Rather, he must have known or intended that the act would result in the possibility of harm to the child.

However, the requisite *mens rea* does not apply to the required circumstances ("likely to produce death or serious physical injury"), and thus the defendant need not have known that the risk of was one of death or serious physical injury.  *State v. Payne*, 233 Ariz. 484, 506, ¶ 70, 314 P.3d 1239, 1261 (2013) (citing appellate court decisions from 1995 and 1991).  Rather knowledge of a risk of any physical harm or harm to the health of the child was sufficient.

**Likelihood of Death or Serious Injury** - Ariz. Rev. Stat. § 13-3623 establishes two different offenses, dependent upon whether the circumstances made death or serious physical injury a likely result of the action.  Such circumstances are required for a conviction under § 13-3623(A) under which Petitioner was convicted.

Death or Serious Physical Injury – The probable risk must be of death or serious physical injury. "Serious physical injury" is defined as "physical injury which creates a reasonable risk of death, or which causes serious or permanent disfigurement, or serious impairment of health or loss or protracted impairment of the function of any bodily organ or limb." A.R.S. § 13–3623(A)(3) (1989).  *See State v. Johnson*, 181 Ariz. 346, 350, 890 P.2d 641, 645 (App. 1995).

Probability Required - "The statute…calls for circumstances 'likely' to cause death or serious physical injury, not merely the possibility that they will."  *State v. Greene*, 168 Ariz. 104, 108, 811 P.2d 356, 360 (App. 1991).  "Likely" has been interpreted literally and means "probable" as compared to "possible." *State v. Johnson*, 181 Ariz. 346, 350, 890 P.2d 641, 645 (App. 1995).

Causation Required - Moreover, such circumstances may not simply exist, but

24

must exist as a result of the endangering conduct.[6]  *See Greene*, 168 Ariz. at 107, 811 P.2d at 359 ("In this case, there was no medical testimony nor any other expert testimony as to the likelihood that any of the children might suffer serious physical injury or death because of the conditions in the home."); and *State v. Lopez*, 2015 WL 8160786, at *5 (App. Dec. 7, 2015) ("circumstances here objectively demonstrated that death or serious physical injury was likely to result from the defendant's conduct").

In the Court's Order for supplementation, the Court  directed Respondents to address, *inter alia*, "(1) the required elements of the offense for which Petitioner was convicted, including whether Petitioner's conduct must have caused the likelihood of death or serious physical injury."  (Order 7/7/16 at 7.) Respondents argue in their Supplemental Response that no causation is required, "it is simply sufficient to show" that the endangerment occurred under such circumstances.  (Supp. Ans., Doc. 20 at 15-16.)

Respondents cite no authority, other than the language of the statute to support their contention.   Respondents do take exception with the Court having cited an unpublished Arizona decision, *State v. West*, 2012 WL 723752 (App. Mar. 5, 2012). (Supp. Ans., Doc. 20 at 16, n. 7.)  However, that case was cited in the Court's Order for the same purpose it is cited herein: to establish the requisite causation in the risk of the basic offense of endangerment, not with regard to causation of the heightened risk of death or serious physical injury.  (*See* Order 7/7/16, Doc. 16 at 3; and *supra* at 21 (Causation of Danger).)   Respondents do not address *Greene* and *Lopez* relied upon herein, even though these were the same cases cited by the Court in seeking argument on this point.  (*See*  Order 7/7/16, Doc. 16 at 5.)

Even if this Court were left to write on a blank slate, the requirement of causation would have to be found in the Arizona statute.  A cardinal principle in construing statues

---

[6] If causation were not required, then arguably every abuse would qualify under 13-3623(A).  This is so because the circumstances are always that (absent supernatural intervention) death is so likely (even certain) to result eventually, from some cause.

is to avoid rendering provisions a nullity.  "Each word, phrase, and sentence must be given meaning so that no part will be void, inert, redundant, or trivial." *City of Phoenix v. Yates*, 69 Ariz. 68, 72, 208 P.2d 1147, 1149 (1949).   All humans exist under circumstances likely (if not certain) to produce death. "[I]n this world nothing can be said to be certain, except death and taxes." Benjamin Franklin, *The Writings of Benjamin Franklin*, Vol. X, 69 (McMillan 1907) (available online at https://archive.org/details/writingsofbenjam10franuoft, last accessed 7/5/16). Thus, without a requirement of some causative or similar relationship, there would be no real distinction between § 13-3623(A) and (B), and all child endangerment would qualify under 13-2623(A).      Only if a causative factor is read into the statute does the reference to circumstances likely to result in death have any meaning.

In addressing Petitioner's claim, the Arizona Court of Appeals recognized his argument that "no evidence presented indicated the delay in seeking medical care of E. 'increased the potential for death or serious physical injury.'"  (Exhibit I, Mem. Dec. 7/15/14 at ¶ 5.)   The court did not reject the contention that such causation was a required element.  Its recitation of the burden of proof simply restated the bare statutory language that the endangerment be "'[u]nder circumstances likely to produce death or serious physical injury.'" (*Id.* at ¶ 8.)   As discussed hereinafter, the court ultimately concluded that causation existed when it found "Varela delayed seeking medical care for E. until her injuries became life-threatening."  (*Id.* at ¶ 12.)  In other words, the court found that Petitioner's endangering delay (at least partially) caused the life-threatening circumstance.

Consequently, the undersigned concludes that a causal link between the actions constituting endangerment and the risk of death or serious physical injury must be shown.

Necessity of Considering Medical Treatment – Respondents argue, without citing authority, that jurors were not required to consider available medical treatment in concluding whether the endangerment occurred "[u]nder circumstances likely to produce

death or serious physical injury." Ariz. Rev. Stat. § 13-3623(A). (*See* Supp. Ans., Doc. 20 at 17-18.) However, nothing in the statute limits the circumstances to be considered in determining whether death or serious physical injury is likely. Thus, if medical treatment is available to the victim, and that treatment can remove the likelihood of death or serious physical injury, there would be no reason to conclude that the circumstances are such that death or serious physical injury is likely to occur.[7]

**Summary** - Thus, to establish a Class 2 endangerment offense under Ariz. Rev. Stat. § 13-3623(A)(2), the prosecution was required to show: (1) that the defendant endangered a child by: (a) undertaking an action that exposed a child to some possible, non-ordinary danger, and (b) did so having knowledge (or intent) of such exposure, and (2) regardless of any lack of knowledge of the defendant, the actual danger caused by the endangerment rose to probable death or serious physical injury.

## 5.  State Court Decision

Petitioner raised his claim of insufficient evidence on direct appeal. Counsel argued that "no evidence was presented that the delay in taking E.V. to the hospital increased the potential for death or serious physical injury." (Exhibit F, Opening Brief at 19.) Counsel argued:

> In the instant case, the state did not present any evidence that E.V. suffered an increased risk of serious physical injury or death by not being taken to the hospital between April 25, 2009 and April 27, 2009. None of the five doctors or two nurses called by the state testified that E.V.'s abscess would have been diagnosed and resolved sooner if she had been taken to the hospital two days earlier. To the contrary, much of the medical evidence described the

---

[7] A contrary conclusion arguably would extend the broad statute even further, allowing convictions of the heightened offense under § 13-3623(A) even where the injury sustained would pose no risk of death or serious physical injury with available medical care. The dirt bike racing child whose broken leg was easily mendable without permanent injury, but who would remain disfigured without such care, (or the malnourished child who would be removed from danger with a few meals of good nutrition) could find their parent facing the kind of sentence imposed on Petitioner. While the Arizona legislature would presumably be free to adopt such a statute, there seems no reason to assume they did so when there is no language in the statute to create the inference they did.

27

lengthy process of laboratory tests, CAT scans, and ultrasounds that were required to diagnose the abscess over a period of days. Dr. D.R stated there was no evidence of an abscess in E.V.'s abdomen when she was admitted to the hospital. (RT, 07/18112 at 110.) Dr. S.L. also testified that at the time of E.V. 's admission, he did not know why she was ill. (RT, 07/25/12 at 11.) The abdominal tear in of itself did not put E.V. at risk of death. (RT, 07/18/12at118-19.) Dr. S.L. testified that it would take days for a hematoma due to the abdominal tear to develop an infection and he could not say exactly what the time frame would be. (RT, 07/25/12 at 44.) Dr. K.C. was more specific, stating that two to three days was the shortest possible time frame for infection to develop. (RT, 07/30/12 at 81, 90.)

No evidence was presented that E.V. might not have needed surgery at all if her treatment began on April 25. Nor was any evidence presented that E.V.'s symptoms on April 25 through April 27 were severe enough that treatment would have begun on those days, even if medical treatment had been sought. Therefore, no evidence was presented that E.V. suffered a greater risk of death or serious physical injury by being brought to a hospital on April 28, 2009.

(*Id.* at 20-21.)

Although Petitioner presented this claim to the Arizona Supreme Court, the last reasoned decision on the claim was that of the Arizona Court of Appeals on direct appeal.  The Arizona Court of Appeals rejected the claim, describing the applicable standard as follows:

The sufficiency of evidence is a question of law which we review *de novo*. Our review is limited to whether substantial evidence exists to support the verdict. Substantial evidence "is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of defendant's guilt beyond a reasonable doubt."

Further, when addressing a sufficiency of the evidence argument, "[w]e construe the evidence in the light most favorable to sustaining the verdict, and resolve all reasonable inferences against the defendant." We will reverse only if there is a complete absence of probative facts to support the conviction. We will not weigh the evidence as that is the function of the jury. "The finder-of-fact, not the appellate court, weighs the evidence and determines the credibility of witnesses." No distinction exists between circumstantial and direct evidence.

(Exhibit I, Mem. Dec. 7/15/14 at ¶¶ 6-7 (citations to state authorities omitted).)

The court described the prosecution's burden of proof as follows:

To sustain a conviction on Count 3, the State had to prove beyond a reasonable doubt that, "[u]nder circumstances likely to produce death or serious physical injury," Varela's intentional or knowing failure to seek medical care for E. for two days after her power

28

struggle with Tricia endangered E.'s "person or health." *See* A.R.S. § 13-3623(A).

(*Id.* at ¶ 8.)

The court cast Petitioner's argument as follows:

> In challenging the sufficiency of the evidence, Varela contends no evidence was presented at trial showing he possessed the necessary *mens rea* to constitute a violation of A.R.S. § 13-3623(A), and he asserts no evidence presented indicated the delay in seeking medical care of E. "increased the potential for death or serious physical injury."

(*Id.* at ¶ 5.)  This casting focused on the *mens rea*, and on the circumstantial condition, *i.e.* that Petitioner's conduct resulted in circumstances likely to cause death or serious physical injury.  It is only the latter argument that Petitioner raises in his habeas Petition.

The court eventually reached several conclusions.  The first addressed the existence of the required circumstances, but avoided the causal link between Petitioner's conduct and the risk of death or serious physical injury:

> There is evidence in the record to support the assertion Varela intentionally or knowingly withheld medical care for E. for two days under circumstances likely to kill or seriously injure her.

(*Id.* at ¶ 8.)

The second conclusion addressed the causal issue, albeit only implicitly:

> Based upon Varela's admissions during the Interview, in addition to the foregoing trial testimony, the jury could reasonably conclude Varela delayed seeking medical care for E. until her injuries became life-threatening because he feared her bruising would lead to allegations of child abuse.

(*Id.* at ¶ 12.)

The third conclusion simply avoided the circumstantial condition, and focused on the endangerment and *mens rea*:

> The evidence therefore supports the jury's determination Varela intentionally or knowingly withheld medical care for E. thereby endangering her health.

(*Id.* at ¶ 12.)

Thus, it was only the second conclusion that directly addressed Petitioner's present claim, that there was insufficient evidence of a causal link between Petitioner's

29

1   conduct and the likelihood of death or serious physical injury.  Or, in the court's words,

2   "Varela delayed seeking medical care for E. until her injuries became life-threatening."

3        The evidence the court cited to support the second conclusion consisted of

4   Petitioner's admissions during the interview, and the following:

5           ¶ 9 Tricia explained to Detective JH that E. had issues going
           to the bathroom, and she and Varela would restrain E. on the toilet
6           for up to an hour while "pushing her mid-section into her legs."  E.
           would struggle and try to get away. During his Interview, Varela
7           admitted that prior to E.'s struggle with Tricia, E.'s belly was
           distended and she had developed bruises from being restrained
8           earlier in the week. He agreed that, generally, upon noticing a
           child's stomach is distended and hurting, a reasonable person would
9           take the child to the doctor. He agreed E.'s fever, vomiting, and
           withholding stool and urine were all red flags indicating something
10          was wrong. And he further admitted taking E. to the doctor was
           going to "raise some flags" based upon the bruising to her arms and
11          legs, and he knew when he took E. to the hospital that CPS would
           be called.
12          ¶ 10 Moreover, the trial evidence revealed that when E.
           arrived at the hospital she was bruised, crying, whimpering, pale,
13          and not moving. Because the hospital did not have the appropriate
           facilities, staff personnel determined E.'s critical condition required
14          she be transferred to the Maricopa Medical Center's pediatric
           intensive care unit. There, doctors determined E.'s abdomen was
15          bruised and distended with decreased bowel sounds, her white cell
           count indicated possible infection, and there were signs she was
16          dehydrated. The abdominal bruising was particularly concerning
           because the lack of bones in that area of the body make accidental
17          bruising difficult. This bruising, in addition to E.'s other symptoms,
           indicated possible trauma and child abuse. In addition, internal
18          bleeding was later found in the muscle layers of E.'s abdomen,
           which resulted in an internal abscess that had to be surgically
19          drained to resolve any infection. E.'s treating physician agreed her
           condition was life-threatening, and E. remained in the pediatric
20          intensive care unit for approximately one month.
           ¶ 11 Doctor Kirsch, a pediatrician who evaluates patients for
21          potential child abuse, opined that E.'s abdominal injuries were
           caused by trauma, specifically, "significant pressure," "crush
22          injury," and "squeezing." She further testified E. was "extremely
           critical ill" and had E. gone untreated "it is possible that she would
23          have died."

24   (Exhibit I, Mem. Dec. 7/15/14 at ¶¶ 9-11.)

25

26   **6.  Application to Facts**

27        **a.   Propriety of State Court's Fact Finding**

28   Petitioner points to no error in the state court's finding of the historical facts,

30

merely the conclusion reached on the basis of those facts. Having reviewed the evidence admitted at trial, the undersigned finds the recitation of the facts by the Arizona Court of Appeals to be a reasonable determination of the facts, at least insofar as the Court stated them.

**b.   Propriety of State Court's Legal Standard**

Petitioner points to no error in the state court's enunciation of the governing rule. Although framed in terms of Arizona state law, the Arizona court plainly relied upon a standard requiring evidence sufficient for reasonable jurors to find the defendant guilty beyond a reasonable doubt.  That is the standard required under *Jackson*.

Petitioner points to no indistinguishable Supreme Court case reaching a contrary result.

Accordingly, Petitioner fails to show that the state court decision was contrary to Supreme Court law.

**c.   Propriety of State Court's Application of Law to Facts**

Petitioner points to no particular error in the state court's application of the law to the facts, apart from the general contention that the evidence failed to support the conclusion that there was sufficient evidence to convict on Count 3.

Having reviewed the courts' application, the undersigned concludes that the state court failed to identify any evidence to support a likelihood of death or serious physical injury, or the causal link between Petitioner's conduct in delaying treatment and the risk of death or serious physical injury.

In evaluating Petitioner's claim, it is important to recall that Petitioner was convicted under Count 3 of intentionally or knowingly endangering the victim by failing to seek medical treatment for the child in the two days that elapsed between the injury and when the victim was taken to the hospital.   Petitioner's contention is that there was insufficient evidence to show the third element of the offence, *i.e.* that the circumstances

were that a likelihood of death or substantial injury would result from his conduct of delaying treatment.  In particular, Petitioner argues that the prosecution "did not present any evidence that the victim suffered an increased risk of serious physical injury or death by not being taken to the hospital between April 25, 2009 and April 27, 2009." (Petition, Doc. 1 at 6b.)

Here, the prosecution was required to show the third element of the offense, *i.e.* that "circumstances likely to produce death or serious physical injury" resulted from Petitioner's conduct, or at least that the likelihood of such results was increased by Petitioner's conduct in delaying treatment.  It was not sufficient to simply show that some risk of some harm was increased by the delay in treatment.  Rather, there must have been evidence that the delay created or increased a likelihood of death or serious physical injury.  Without such evidence, Petitioner could have been reasonably found guilty of the Class 4 felony under § 13-3623(B)(1) (for which a likelihood of the increased harm is not required), but not of the Class 2 felony for which he was convicted.

Counsel correctly argued on direct appeal that there was no direct, medical evidence that Petitioner's delay caused the requisite life-threatening circumstances, particularly with regard to the abscess, which had not yet formed until after the victim's admission to the hospital.  Indeed, the whole issue was avoided by the prosecution.

Moreover, the medical testimony was not even that in light of the medical treatment being supplied, death or serious physical injury was "likely," *i.e.* probable.  Dr. Rosenberg merely opined that the victim "could have died." (Exhibit MM, R.T. 7/18/12 at 106-107.)   Dr. Kirsch offered only that the "possible outcome" was that the victim "could have potentially died…that was a risk" (Exhibit PP, R.T. 7/25/12 at 68-69), death was threatened (*id.* at 88-89), "possible" (*id.* at 100), "could have died" or "people can die" (*id.* at 121-122), "could have been in a life threatening situation" (*id.* at 132-133).  Moreover, the premise of Dr. Kirsch's opinion was not in light of the medical treatment made available, but "if she had not received medical treatment" (*id.* at 69), "if she had not had medical treatment for it" (*id.* at 88-89), if it had "gone on untreated" (*id.* at 100),

"if she had not received medical  treatment" (*id.* at 121-122), "had she not gotten the treatment" (*id.* at 132-133).   Dr. Chundhu was more affirmative, stating that the condition "will have been fatal," but that was only if the "patient hadn't responded," and thus was based on the presumption that either treatment was never provided, or that he victim's body hadn't responded to treatment, with whatever potential there might have been for that to occur. (Exhibit RR, R.T. 7/30/12 at 102.)  The remainder of the providers proffered no opinion on the point, including Dr. Bailey (Exhibit NN, R.T. 7/23/12 at 61-90), RN Giannini (Exhibit NN, R.T. 7/23/12 at 92-111), Dr. Lal (Exhibit PP, R.T. 7/25/12 at 4-46), and RN Joseph (Exhibit TT, R.T. 8/6/12 at 6-25).

If that were all the evidence for the jury to consider, this Court would have to conclude that the Arizona Court of Appeals' decision that the offense had been sufficiently proven would have been an unreasonable application of federal law. However, a jury is not limited to direct evidence, but may make reasonable inferences from circumstantial evidence.

As concluded by the Arizona Court of Appeals, the extent of the victim's injuries, the progress of the victim's health from the altercation on Saturday until she was taken to the hospital, and her physical condition upon admission and progression thereafter, were evidence from which a jury could make a reasonable inference that Petitioner's delay increased the risk of death or serious physical injury to or beyond the point of being a probability.  The evidence showed that by the time of admission, the victim displayed wide spread bruising, was showing symptoms of the systemic inflammatory response (e.g. fever), was in substantial pain, had a distended abdomen (which later came to be recognized as caused by the abdominal tear and bleeding), dehydration, decreased blood counts indicating loss of blood and bacterial infection, was vomiting bile, and was dehydrated.

And, despite the fact that most providers only deemed death a possibility, the jury could come to their own conclusion and reasonably infer that it was instead a probability. The trier of fact "need not be bound by expert medical testimony at all if other probative

33

evidence points to a different result." *United States v. Glover*, 596 F.2d 857, 865 (9th Cir. 1979). *See Mims v. United States*, 375 F.2d 135, 144 (5th Cir. 1967) (detailing considerations that can justify a jury in ignoring expert testimony).   This is especially so because there was no testimony indicating that the possibility was necessarily less than a probability.

Moreover, the jury could reasonably infer that had Petitioner sought medical treatment sooner, the various treatments which could have been and ultimately were provided upon the victim's admission to the hospital, e.g. hydration, antibiotics, etc., could have increased the victim's ability to fight off the infection and thwart the life threatening abscess thereby reducing the probability of death or serious physical injury, rather than progressing as she did.[8]

Moreover, even if this Court harbored some doubt whether the other evidence was sufficient to establish the causation under *Jackson*, the undersigned cannot say that a decision of the Arizona Court of Appeals to the contrary would have been unreasonable.

Accordingly, Petitioner's sole ground for relief is without merit and must be denied.

## IV.   CERTIFICATE OF APPEALABILITY

**Ruling Required** - Rule 11(a), Rules Governing Section 2254 Cases, requires that in habeas cases the "district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   Such certificates are required in cases concerning detention arising "out of process issued by a State court", or in a proceeding under 28 U.S.C. § 2255 attacking a federal criminal judgment or sentence. 28 U.S.C. § 2253(c)(1).

---

[8] Respondents also point to a variety of other evidence to show such causation, including Petitioner's knowledge of the injuries to the victim, decision to delay treatment, and fear of an investigation.  (Supp. Ans., Doc. 20 at 16-17.)  While perhaps relevant to the *mens rea* necessary to establish the basic endangerment, such facts do nothing to establish causation of a likelihood of death or serious physical injury.

Here, the Petition is brought pursuant to 28 U.S.C. § 2254, and challenges detention pursuant to a State court judgment. The recommendations if accepted will result in Petitioner's Petition being resolved adversely to Petitioner. Accordingly, a decision on a certificate of appealability is required.

**Applicable Standards** - The standard for issuing a certificate of appealability ("COA") is whether the applicant has "made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). "When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

**Standard Not Met** - Assuming the recommendations herein are followed in the district court's judgment, that decision will be on the merits. Under the reasoning set forth herein, jurists of reason would not find the district court's assessment of the constitutional claims debatable or wrong.

Accordingly, to the extent that the Court adopts this Report & Recommendation as to the Petition, a certificate of appealability should be denied.

## V.   RECOMMENDATION

**IT IS THEREFORE RECOMMENDED** that the Petitioner's Petition for Writ of Habeas Corpus, filed October 1, 2015 (Doc. 1) be **DENIED**.

**IT IS FURTHER RECOMMENDED** that, to the extent the foregoing findings and recommendations are adopted in the District Court's order, a Certificate of

Appealability be **DENIED**.

## VI.    EFFECT OF RECOMMENDATION

This recommendation is not an order that is immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to *Rule 4(a)(1), Federal Rules of Appellate Procedure*, should not be filed until entry of the district court's judgment.

However, pursuant to *Rule 72(b), Federal Rules of Civil Procedure,* the parties shall have fourteen (14) days from the date of service of a copy of this recommendation within which to file specific written objections with the Court.  *See also* Rule 8(b), Rules Governing Section 2254 Proceedings.   Thereafter, the parties have fourteen (14) days within which to file a response to the objections.  Failure to timely file objections to any findings or recommendations of the Magistrate Judge will be considered a waiver of a party's right to *de novo* consideration of the issues,  *see United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003)(*en banc*),  and will constitute a waiver of a party's right to appellate review of the findings of fact in an order or judgment entered pursuant to the recommendation of the Magistrate Judge, *Robbins v. Carey*, 481 F.3d 1143, 1146-47 (9th Cir. 2007).

Dated: November 15, 2016

15-1971r RR 16 06 23 on HC.docx

James F. Metcalf
United States Magistrate Judge

36